United States Courts
Southern District of Texas
FILED

December 16, 2020

David J. Bradley, Clerk of Court

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO. H-20-CR-305-S-1** |
| | § | |
| **JOSE LUIS DE JONGH-ATENCIO,** | § | |
| | § | |
| **DEFENDANT** | § | |

## SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES:

## Introduction

At all relevant times, unless otherwise specified:

1.     Petróleos de Venezuela S.A. ("PDVSA") was the Venezuelan state-owned and state-controlled oil company.  PDVSA and its subsidiaries and affiliates were responsible for, among other things, the exploration, production, refining, transportation, marketing, and trade in energy resources in Venezuela and provided funding for other operations of the Venezuelan government.  PDVSA and its wholly-owned subsidiaries, were owned and controlled by, and performed functions of, the Venezuelan government, and were "instrumentalities" of a foreign government as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

2.     Citgo Petroleum Corporation ("Citgo"), based in Houston, Texas, was a wholly-owned subsidiary of PDVSA that acted primarily as a refiner, transporter, and marketer of petroleum-based products, but also procured goods and services on behalf of PDVSA through its Special Projects group.  Citgo was indirectly owned and controlled by, and performed functions of, the Venezuelan government, and was an "instrumentality" of a foreign government as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A).

3.     Defendant **JOSE LUIS DE JONGH ATENCIO** ("**DE JONGH**"), a Venezuelan citizen and resident of Texas, and, since May 2015, a United States citizen, was employed by PDVSA, and by wholly-owned subsidiaries and affiliates thereof, including Citgo, beginning in or around 2010.  **DE JONGH** held various positions in Citgo's legal and procurement departments.  Specifically, **DE JONGH** was a procurement officer in Citgo's Special Projects group beginning in or around 2012.  **DE JONGH** later was promoted to become the manager of the Special Projects group.  **DE JONGH** left the Special Projects group in or around 2015, and was terminated from his employment at Citgo in or around February 2018.  While employed at PDVSA and its wholly-owned subsidiaries and affiliates, including Citgo, **DE JONGH** was a "foreign official" as that term is used in the FCPA, Title 15, United States Code, Sections 78dd-2(h)(2)(A) and 78dd-3(f)(2)(A), and a

2

"fiduciary" of Citgo, which is a "beneficiary," as those terms are defined in the Texas Commercial Bribery Statute, Texas Penal Code § 32.43.

**The Defendant's Co-Conspirators, Associates, and Other Relevant Entities**

4.      Jose Manuel Gonzalez Testino ("Gonzalez"), who has been charged separately, was a dual U.S.-Venezuelan citizen and controlled, together with others, a number of closely-held companies, including several U.S. companies that Gonzalez used to secure contracts to supply equipment and services to PDVSA. Gonzalez was a "domestic concern" and an officer, director, employee, and agent of a "domestic concern," and a stockholder thereof acting on behalf of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

5.      Tulio Anibal Farias Perez ("Farias"), who has been charged separately, was a Venezuelan citizen and, since August 2014, a resident of Texas. Farias was Gonzalez's partner with a fifty percent ownership stake in several closely-held companies, including U.S. companies, which Gonzalez and Farias used to secure contracts with PDVSA. Farias was a "domestic concern" and an officer, director, employee, and agent of a "domestic concern," and a stockholder thereof acting on behalf of a "domestic concern," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

6.     "Employee A," a person whose identity is known to the Grand Jury, was an individual who worked for Gonzalez, including at one of his U.S.-based companies.  Employee A's job responsibilities included handling PDVSA contracts for a logistics company controlled by Gonzalez, as well as tracking purchase orders and bribe payments related to multiple other companies, including those companies controlled by Farias and Gonzalez.  Employee A was an employee of a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

7.     "Relative 1," a person whose identity is known to the Grand Jury, was a relative of **DE JONGH's** whose name was listed as the owner and signatory on multiple bank accounts used in connection with the scheme, including a bank account in Switzerland and bank accounts in the Southern District of Texas.

8.     "Associate 1," a person whose identity is known to the Grand Jury, was an associate of **DE JONGH's** whose name was listed as the owner and signatory on a bank account located in the Southern District of Texas that was used in connection with the scheme.

9.     "Associate 2," a person whose identity is known to the Grand Jury, was an associate of **DE JONGH's** whose name was listed as the owner and signatory on a bank account in Panama and a bank account in the Southern District of Texas, both of which were used in connection with the scheme.

10.     "Company A," a logistics company whose identity is known to the Grand Jury, existed as a corporation under the laws of Florida, and later Panama, and was controlled by Gonzalez.   Company A was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A).

11.     "Company B," a company whose identity is known to the Grand Jury, existed as a corporation under the laws of Florida, and later Panama and Switzerland, and was controlled by Gonzalez and Farias.  Company B was a "domestic concern" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(A).

12.      "Shell Company A," a company whose identity is known to the Grand Jury, was organized under the laws of Venezuela and was the listed owner of a bank account in Panama.

13.     "Shell Company B," a company whose identity is known to the Grand Jury, was organized under the laws of Panama and was the listed owner of a bank account in Panama.

14.     "Shell Company C," a company whose identity is known to the Grand Jury, was organized under the laws of the British Virgin Islands and was the listed owner of a bank account in Switzerland.

15.     "Title Company A," a company whose identity is known to the Grand Jury, is a title company with offices across the United States.

16.     "Panama Account 1," a bank account whose identity is known to the Grand Jury, was a Panamanian bank account in the name of Shell Company A. **DE JONGH** was the signatory and owner of Panama Account 1.  Panama Account 1 was used in connection with the scheme.

17.     "Panama Account 2," a bank account whose identity is known to the Grand Jury, was a Panamanian bank account in the name of Shell Company B. Associate 2 was the signatory and owner of Panama Account 2.  Panama Account 2 was used in connection with the scheme.

18.     The "Swiss Account," a bank account whose identity is known to the Grand Jury, was a Swiss bank account in the name of Shell Company C that had a U.S. Dollar-denominated account and a Euro-denominated account.  Relative 1 was the signatory on the Swiss Account.  The Swiss Account was used in connection with the scheme.

19.     "Texas Account 1," a bank account whose identity is known to the Grand Jury, was a bank account in the Southern District of Texas in the name of Relative 1.  Texas Account 1 was used in connection with the scheme.

20.     "Texas Account 2," a bank account whose identity is known to the Grand Jury, was a bank account in the Southern District of Texas in the name of Relative 1.  Texas Account 2 was used in connection with the scheme.

21.     "Texas Account 3," a bank account whose identity is known to the Grand Jury, was a bank account in the Southern District of Texas in the name of Associate 1.  Texas Account 3 was used in connection with the scheme.

22.     "Texas Account 4," a bank account whose identity is known to the Grand Jury, was a bank account in the Southern District of Texas in the name of Associate 2.  Texas Account 4 was used in connection with the scheme.

### **The Scheme**

23.     Beginning in or about 2013, Gonzalez, Farias, and others known and unknown to the Grand Jury, offered, paid, promised, and authorized the payment of bribes to **DE JONGH** in the form of monetary payments, gifts, and other things of value, in exchange for **DE JONGH** providing improper advantages in order for Gonzalez, Farias, their businesses and others to obtain and retain business with Citgo and PDVSA, including with Citgo's Special Projects group, without the consent of Citgo.

24.     As part of the scheme, **DE JONGH** agreed to accept, and accepted, payments, gifts, and other things of value in exchange for assisting Gonzalez, Farias, and others known and unknown to the Grand Jury with obtaining and retaining business with Citgo and PDVSA, including with Citgo's Special Projects group, without the consent of Citgo.

25.     In order to promote the illegal bribery scheme and to conceal the nature and purpose of the proceeds of the illegal bribery scheme, **DE JONGH** directed and caused Gonzalez, Farias, and others known and unknown to the Grand Jury, to send the payments to accounts in the names of his relatives and associates, and to offshore accounts including accounts in the names of Shell Company A and Shell Company C.  **DE JONGH** and his co-conspirators created false invoices to justify these payments.  On at least one occasion, **DE JONGH** directed a payment to Title Company A for a real estate investment.

26.     In accepting payments from Gonzalez, Farias, and others known and unknown to the Grand Jury, **DE JONGH** violated various policies and procedures of Citgo, including policies governing employee ethics and conflicts of interest.

27.     In furtherance of the scheme, **DE JONGH** laundered the bribe proceeds by causing funds to be sent from bank accounts held in the name of one shell company to another, specifically from Shell Company A to Shell Company B, and then to accounts held in the names of his associates.

28.     For example, **DE JONGH** caused bribe proceeds to be transferred through a series of bank accounts, including from Panama Account 1, in the name of Shell Company A, to Panama Account 2, in the name of Shell Company B, from Panama Account 2 to Texas Account 4, and from Texas Account 4 to Texas Account 1.  After being transferred through two Panamanian accounts and two

Texas accounts, these bribe proceeds were ultimately used to purchase residential real estate in **DE JONGH's** name in the Southern District of Texas.

29.     In furtherance of the scheme, **DE JONGH** also laundered the bribe proceeds sent to the Swiss Account in a similar fashion.  Between in or around 2014 and 2019, **DE JONGH** caused wires to be sent from the Swiss Account to Texas Account 1, Texas Account 2, and Texas Account 3, none of which were in **DE JONGH's** name.  The bribe proceeds were ultimately used to purchase real estate, were invested, or were laundered through additional accounts such as Texas Account 2, before being transferred again to accounts in **DE JONGH's** name.

## The Purchase of the 440 Cobia Property

30.     On or about May 22, 2014, Gonzalez and Farias caused Company B to wire $119,982.50 to Texas Account 3.

31.     On or about May 22, 2014, **DE JONGH** caused a cashier's check to Title Company A, in the amount of $120,000, to be drawn on Texas Account 3 to be used towards the purchase of six units of commercial property located at 440 Cobia Drive in Katy, Texas.

32.     On or about July 28, 2014, Gonzalez caused approximately $1.4 million to be wired from a Swiss account in the name of one of his relatives to an account in the United States.

9

33.     On or about July 29, 2014, Gonzalez caused the U.S. account discussed in Paragraph 32 to wire $1,386,964.40 to Title Company A to complete the purchase of six units of commercial property located at 440 Cobia Drive in Katy, Texas.

## The Panamanian Accounts and Transfers

34.     On or about the following dates, Gonzalez, Farias, and Employee A caused bribe payments for **DE JONGH**'s benefit to be sent to Panama Account 1, as follows:

| Paragraph | Date | Bank Account | Amount |
|:---:|:---:|:---:|:---:|
| (a) | 12/19/2013 | Panama Account 1 | $15,000.00 |
| (b) | 1/2/2014 | Panama Account 1 | $15,000.00 |
| (c) | 1/15/2014 | Panama Account 1 | $15,000.00 |
| (d) | 1/31/2014 | Panama Account 1 | $15,000.00 |
| (e) | 2/14/2014 | Panama Account 1 | $15,000.00 |
| (f) | 3/6/2014 | Panama Account 1 | $15,000.00 |
| (g) | 3/18/2014 | Panama Account 1 | $15,000.00 |
| (h) | 4/1/2014 | Panama Account 1 | $15,000.00 |
| (i) | 4/15/2014 | Panama Account 1 | $15,000.00 |
| (j) | 4/30/2014 | Panama Account 1 | $15,000.00 |
| (k) | 6/6/2014 | Panama Account 1 | $30,000.00 |
| (l) | 6/19/2014 | Panama Account 1 | $15,000.00 |

| Paragraph | Date | Bank Account | Amount |
|:---:|:---:|:---:|:---:|
| (m) | 12/2/2014 | Panama Account 1 | $100,000.00 |
| (n) | 12/10/2014 | Panama Account 1 | $100,000.00 |
| (o) | 12/26/2014 | Panama Account 1 | $100,000.00 |
| (p) | 1/5/2015 | Panama Account 1 | $180,000.00 |

35.     Between approximately May 7, and May 11, 2015, **DE JONGH** caused $950,000 to be transferred from Panama Account 1 to Panama Account 2.

36.     On or about July 1, 2015, **DE JONGH** caused $949,500 to be wired from Panama Account 2 to Texas Account 4.

37.     On or about July 2, 2015, **DE JONGH** caused nearly all of the remaining funds, $4,890.00, in Panama Account 1 to be transferred to Panama Account 2.

38.     On or about July 2, 2015, **DE JONGH** caused $5,241.00 to be wired from Panama Account 2 to Texas Account 4.

39.     On or about December 27, 2016, **DE JONGH** caused $903,000 to be transferred from Texas Account 4 to Texas Account 1.

40.     On or about December 27, 2016, **DE JONGH** caused a cashier's check to Title Company A in the amount of $899,625.13 to be drawn on Texas Account 1 to purchase residential property.

11

**The Swiss Account and Transfers**

41.     On or about the following dates, Gonzalez and Farias caused bribe

payments for **DE JONGH's** benefit to be sent to the Swiss Account, as follows:

| Paragraph | Date | Bank Account | Amount |
|:---:|:---:|:---:|:---:|
| (a) | 10/13/2014 | Swiss Account | $10,000.00 |
| (b) | 10/15/2014 | Swiss Account | $90,000.00 |
| (c) | 10/24/2014 | Swiss Account | $100,000.00 |
| (d) | 2/6/2015 | Swiss Account | €347,826.00 |
| (e) | 2/24/2015 | Swiss Account | $30,000.00 |
| (f) | 7/15/2015 | Swiss Account | €22,730.00 |
| (g) | 7/31/2015 | Swiss Account | $25,000.00 |
| (h) | 8/17/2015 | Swiss Account | €22,522.00 |
| (i) | 9/1/2015 | Swiss Account | $50,000.00 |
| (j) | 10/6/2015 | Swiss Account | $25,000.00 |
| (k) | 2/3/2016 | Swiss Account | €133,000.00 |
| (l) | 5/19/2016 | Swiss Account | €25,630.00 |
| (m) | 3/7/2017 | Swiss Account | $440,000.00 |
| (n) | 4/10/2017 | Swiss Account | $440,000.00 |
| (o) | 6/13/2017 | Swiss Account | $200,000.00 |
| (p) | 7/6/2017 | Swiss Account | $33,000.00 |

42.     On or about December 10, 2014, **DE JONGH** caused $130,083.28 to

be wired from the Swiss Account to Texas Account 3.

43.     On or about May 15, 2015, **DE JONGH** caused $563,088.19 to be wired from the Swiss Account to Texas Account 1.

44.     On or about February 24, 2017, **DE JONGH** sent Gonzalez an email with the subject line, as translated into English, "for invoice (ATTACHED IN EXCEL SO INVOICE CAN BE EDITED)" and attached an Excel file.  The Excel file contained a blank template for an invoice for Shell Company C and directed the recipient of the invoice to pay the Swiss Account.

45.     On or about May 27, 2017, Gonzalez sent an email to two of his business associates instructing them, in part, and as translated into English, to transfer $200,000 to the Swiss Account.

46.     On or about June 13, 2017, a company under Gonzalez's control wired $200,000 to the Swiss Account.

47.     On or about June 21, 2019, **DE JONGH** caused $280,051.40 to be wired from the Swiss Account to Texas Account 2.

48.     On or about June 28, 2019, **DE JONGH** caused $280,000 to be transferred from Texas Account 2 to Texas Account 1.

49.     On or about June 28, 2019, **DE JONGH** caused $250,029 to be transferred from Texas Account 1 to an account in his own name in the Southern District of Texas.

50.     On or about July 5, 2019, **DE JONGH** caused $30,029 to be transferred from Texas Account 1 to the same account in his own name referenced in Paragraph 49.

### Travel, Entertainment, and Other Things of Value

51.     In or about October 2014, Farias accompanied **DE JONGH** to a World Series game in San Francisco, California, between the Kansas City Royals and San Francisco Giants.  Gonzalez and Farias paid for the tickets to the game and other associated expenses.

52.     On or about February 1, 2015, Farias and another co-conspirator accompanied **DE JONGH** to Super Bowl XLIX, in Glendale, Arizona.  Gonzalez, Farias, and the other co-conspirator paid for the tickets to the game and other associated expenses.

53.     On or about May 16, 2017, Gonzalez gave **DE JONGH** tickets for the U2 concert on June 11, 2017, in Miami, Florida.

### <u>COUNT ONE</u>
### (18 U.S.C. § 1956(h) – Conspiracy to Launder Money)

54.     Paragraphs 1 through 53 are realleged and incorporated by reference as though fully set forth herein.

55.     From in or around 2013 and continuing through at least 2019, in the Southern District of Texas and elsewhere, the defendant,

**JOSE LUIS DE JONGH ATENCIO**,

14

did willfully, that is, with the intent to further the objects of the conspiracy, and
knowingly conspire with others known and unknown to the Grand Jury, including
Gonzalez, Farias, Employee A, and others, to commit offenses under Title 18,
United States Code, Section 1956, namely:

  a. knowing that the property involved in a financial transaction
     represented the proceeds of some form of unlawful activity, to
     conduct and attempt to conduct such a financial transaction which in
     fact involved the proceeds of specified unlawful activity, knowing that
     the transaction was designed in whole or in part to conceal and
     disguise the nature, the location, the source, the ownership, and the
     control of the proceeds of one or more specified unlawful activities,
     namely, (i) bribery of a foreign official, a felony violation of the
     FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3, and
     (ii) commercial bribery, a violation of the Travel Act, 18 U.S.C.
     § 1952(a)(1) and (3), and Texas Penal Code § 32.43, in violation of
     Title 18, United States Code, Section 1956(a)(1)(B)(i); and

  b. with the intent to promote the carrying on of one or more specified
     unlawful activities, namely, (i) bribery of a foreign official, a felony
     violation of the FCPA, Title 15, United States Code, Sections 78dd-2
     and 78dd-3, and (ii) commercial bribery, a violation of the Travel Act,

18 U.S.C. § 1952(a)(1) and (3), and Texas Penal Code § 32.43, transport, transmit, and transfer, and attempt to transport, transmit, and transfer, a monetary instrument and funds from a place outside of the United States to and through a place in the United States, and from a place in the United States to and through a place outside of the United States, in violation of Title 18, United States Code, Section 1956(a)(2)(A).

## Manner and Means of the Conspiracy

56.     The manner and means by which **DE JONGH** and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

57.     Gonzalez, Farias, and others offered, promised, authorized, paid, and agreed to pay bribes to **DE JONGH** in exchange for **DE JONGH** agreeing to provide an improper advantage to Gonzalez, Farias, and others in order for them to corruptly obtain and retain business with PDVSA and Citgo, without the consent of Citgo.

58.     **DE JONGH's** assistance included, but was not limited to:

   a.   providing inside information to assist Gonzalez and Farias in order
        to give them an advantage in submitting bids for and winning
        PDVSA contracts;

b.  assisting Gonzalez and Farias in identifying an appropriate manufacturer whom Gonzalez and Farias could represent, through Company B, as the distributor, in bidding for, winning, and executing PDVSA and Citgo contracts; and

c.  assisting Company A, Gonzalez's logistics company, by providing business advantages that allowed Company A to procure a more favorable contract with Citgo than other logistics vendors that contracted with Citgo.

59.    **DE JONGH**, together with others, including Gonzalez and Farias, caused bribe payments to be to be made to bank accounts in the names of recipients other than **DE JONGH**, including to intermediaries, relatives, and overseas bank accounts in the names of companies, including Shell Company A and Shell Company C, for the purpose of concealing and disguising the nature, location, source, ownership and control of the proceeds of the illegal bribery scheme.

60.    **DE JONGH**, together with others, agreed to conceal and disguise the nature, location, source, ownership and control of the proceeds of the illegal bribery scheme through real estate transactions, including transactions in which **DE JONGH** and Gonzalez were nominally partners, but in which Gonzalez made the bulk of the investment and **DE JONGH** retained the bulk of the benefits.

17

61. **DE JONGH,** together with others, created and caused to be created fake and fraudulent invoices to further the scheme and to conceal and disguise the proceeds of the illegal bribery scheme.

62. **DE JONGH**, together with others, communicated about the scheme, including through email and other means, including while located in the United States.

63. **DE JONGH**, together with others, engaged in monetary transactions among various accounts designed to promote the illegal bribery scheme and to conceal the nature, source, and ownership of the proceeds of the illegal bribery scheme.

64. **DE JONGH** used the proceeds of the illegal bribery scheme to conduct personal financial transactions for himself and his relatives, including purchasing real estate in the United States, including in the Southern District of Texas.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS TWO THROUGH FIVE
### (Money Laundering – 18 U.S.C. § 1956(a)(1)(B)(i); 18 U.S.C. § 2)

65. Paragraphs 1 through 53 and 56 through 64 are realleged and incorporated by reference as though fully set forth herein.

66. On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant,

18

## JOSE LUIS DE JONGH ATENCIO,

did knowingly conduct, and aid, abet, and cause others to conduct, and attempt to

conduct, the following financial transactions affecting interstate and foreign

commerce, which transactions involved the proceeds of specified unlawful activity,

knowing that the property involved in the financial transactions represented the

proceeds of some form of unlawful activity, and that the financial transactions

were designed, in whole and in part, to conceal and disguise the nature, the

location, the source, the ownership, and the control of the proceeds of one or more

specified unlawful activities, namely, (i) a felony violation of the FCPA, Title 15,

United States Code, Sections 78dd-2 and 78dd-3; and (ii) commercial bribery, a

violation of the Travel Act, 18 U.S.C. § 1952(a)(1) and (3), and Texas Penal Code

§ 32.43, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); as

follows:

| COUNT | DATE | MONETARY TRANSACTION |
|-------|------|----------------------|
| Two | May 15, 2015 | $563,088.19 wire transfer from the Swiss Account to Texas Account 1 |
| Three | July 1, 2015 | $949,500.00 wire transfer from Panama Account 2 to Texas Account 4 |
| Four | February 14, 2019 | $350,050.08 wire transfer from the Swiss Account to Texas Account 2 |
| Five | June 21, 2019 | $280,051.40 wire transfer from the Swiss Account to Texas Account 2 |

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i)

and 2.

## COUNT SIX
### (Money Laundering – 18 U.S.C. § 1957; 18 U.S.C. § 2)

67.     Paragraphs 1 through 53 and 56 through 64 are realleged and incorporated by reference as though fully set forth herein.

68.     On or about December 27, 2016, in the Southern District of Texas and elsewhere, the defendant,

**JOSE LUIS DE JONGH ATENCIO,**

did knowingly engage in, and aid, abet, and cause others to engage in, and attempt to engage in, a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000, such funds having been derived from one or more specified unlawful activities, namely: (i) bribery of a foreign official, a felony violation of the FCPA, Title 15, United States Code, Sections 78dd-2 and 78dd-3; and (ii) commercial bribery, a violation of the Travel Act, 18 U.S.C. § 1952(a)(1) and (3), and Texas Penal Code § 32.43, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); that is, a cashier's check to Title Company A in the amount of $899,625.13, drawn on Texas Account 2.

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT SEVEN
### (Conspiracy – 18 U.S.C. § 371)

69.     Paragraphs 1 through 53 and 56 through 64 are realleged and incorporated by reference as though fully set forth herein.

70.     From in or around 2013 and continuing through at least 2019, in the

Southern District of Texas and elsewhere, the defendant,

**JOSE LUIS DE JONGH ATENCIO,**

did willfully, that is, with intent to further the objects of the conspiracy, and

knowingly, conspire, confederate, and agree with Gonzalez, Farias, and others

known and unknown to the Grand Jury, to commit offenses against the United

States, that is, knowingly and intentionally traveling in interstate and foreign

commerce and using and causing to be used the mail and facilities in interstate and

foreign commerce with the intent to promote, manage, establish, carry on,

distribute the proceeds of, and facilitate the promotion, management establishment,

carrying on, and distribution of the proceeds of an unlawful activity, that is,

commercial bribery, in violation of the laws of the State of Texas, Penal Code

§ 32.43, and thereafter performing and attempting to perform acts in furtherance of

the unlawful activity, in violation of Title 18, United States Code, Section

1952(a)(1) and (3).

## Purpose of the Conspiracy

71.     The purpose of the conspiracy was for **DE JONGH**, Gonzalez, Farias,

Employee A, and others known and unknown to the Grand Jury, to illegally enrich

themselves by entering into a corrupt agreement whereby Gonzalez, Farias,

Employee A, and others paid and concealed bribes to **DE JONGH**, a fiduciary of

Citgo, in exchange for **DE JONGH** agreeing to take and taking actions to assist Gonzalez, Farias, Employee A, and others to secretly and illegally gain an improper advantage in obtaining and retaining business with Citgo, without the consent of Citgo.

## **Manner and Means of the Conspiracy**

72.     The manner and means by which **DE JONGH** and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following, while in the Southern District of Texas and elsewhere:

73.     Gonzalez, Farias, and others offered, promised, authorized, paid, and agreed to pay bribes to **DE JONGH** in exchange for **DE JONGH** agreeing to provide an improper advantage to Gonzalez, Farias, and others in order for them to corruptly obtain and retain business with PDVSA and Citgo, without the consent of Citgo.

74.     **DE JONGH**'s assistance included, but was not limited to:

    a.  providing inside information to assist Gonzalez and Farias in order to give them an advantage in submitting bids for and winning PDVSA contracts;

    b.  assisting Gonzalez and Farias in identifying an appropriate manufacturer whom Gonzalez and Farias could represent, through

Company B, as the distributor, in bidding for, winning, and

executing PDVSA and Citgo contracts; and

c.  assisting Company A, Gonzalez's logistics company, by providing

business advantages that allowed Company A to procure a more

favorable contract with Citgo than other logistics vendors that

contracted with Citgo.

75.  **DE JONGH**, Gonzalez, Farias, Employee A, and others known and

unknown to the Grand Jury, utilized facilities in interstate or foreign commerce,

including communicating by telephone, text messaging and other internet-based

messaging services, and email in connection with the scheme, and causing wire

transfers to be sent in connection with the scheme.

76.  **DE JONGH**, Gonzalez, Farias, Employee A, and others known and

unknown to the Grand Jury engaged in interstate travel, including between

Houston, Texas and Miami, Florida, and travel to the events described in

Paragraphs 51-53, in connection with the scheme.

## Overt Acts

77.  In furtherance of the conspiracy and to achieve the objects thereof, at

least one of the co-conspirators committed or caused to be committed, in the

Southern District of Texas and elsewhere, at least one of the following overt acts,

among others:

23

78.     Between approximately December 19, 2013, and January 1, 2015, as delineated in paragraph 34, Gonzalez, Farias, and Employee A caused bribe payments for **DE JONGH**'s benefit to be sent to Panama Account 1.

79.     Between approximately May 7 and May 11, 2015, **DE JONGH** caused $950,000 to be transferred from Panama Account 1 to Panama Account 2.

80.     On or about July 1, 2015, **DE JONGH** caused $949,500 to be wired from Panama Account 2 to Texas Account 4.

81.     On or about July 2, 2015, **DE JONGH** caused nearly all of the remaining funds, $4,890.00, in Panama Account 1 to be transferred to Panama Account 2.

82.     On or about July 2, 2015, **DE JONGH** caused $5,241.00 to be wired from Panama Account 2 to Texas Account 4.

83.     Between approximately October 13, 2014, and July 6, 2017, as delineated in paragraph 41, Gonzalez, Farias, and Employee A caused bribe payments for **DE JONGH's** benefit to be sent to the Swiss Account.

84.     On or about February 24, 2017, **DE JONGH** sent Gonzalez an email with the subject line, as translated into English, "for invoice (ATTACHED IN EXCEL SO INVOICE CAN BE EDITED)" and attached an Excel file.  The Excel file contained a blank template for an invoice for Shell Company C and directed the recipient of the invoice to pay the Swiss Account.

24

85.     On or about June 28, 2019, **DE JONGH** caused $250,029 to be transferred from Texas Account 1 to an account in his own name in the Southern District of Texas.

86.     On or about July 5, 2019, **DE JONGH** caused $30,029 to be transferred from Texas Account 1 to the same account in his own name referenced in Paragraph 85.

All in violation of Title 18, United States Code, Section 371.

## COUNTS EIGHT THROUGH TEN
**(Travel Act – Texas Commercial Bribery, 18 U.S.C. §1952; 18 U.S.C. § 2)**

87.     Paragraphs 1 through 53, 56 through 64, and 71 through 86 are realleged and incorporated by reference as though fully set forth herein.

88.     On or about the dates set forth below, in the Southern District of Texas and elsewhere, the defendant

### JOSE LUIS DE JONGH ATENCIO,

aided and abetted by others known and unknown to the Grand Jury, did knowingly travel in and use the mail and facilities in interstate and foreign commerce and cause the travel in and use of the mail and facilities in interstate and foreign commerce, as described in the counts listed below, with the intent to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management establishment, carrying on, and distribution of the proceeds of an unlawful activity, that is, commercial bribery, in violation of the laws of the State

25

of Texas, Penal Code § 32.43, and thereafter did perform and attempt to perform

an act to promote, manage, establish, carry on, distribute the proceeds of, and

facilitate the promotion, management, establishment, carrying on, and distribution

of the proceeds in furtherance of the unlawful activity.

| COUNT | DATE | USE OF FACILITY IN INTERSTATE COMERCE |
|-------|------|---------------------------------------|
| Eight | July 2, 2015 | $5,241.00 wire transfer from Panama Account 2 to Texas Account 4 |
| Nine | February 24, 2017 | Email from **DE JONGH** to Gonzalez attaching Excel file containing blank template for an invoice for Shell Company C directing the recipient of the invoice to pay the Swiss Account |
| Ten | June 28, 2019 | $250,029 wire transfer from Texas Account 1 to an account in **DE JONGH's** name |

All in violation of Title 18, United States Code, Sections 1952(a)(1) and (3) and 2.

## NOTICE OF FORFEITURE
### (18 U.S.C. § 982(a)(1))

89.     Pursuant to Title 18, United States Code, Section 982(a)(1), the

United States gives notice to **JOSE LUIS DE JONGH ATENCIO** that in the

event of his conviction of any of the offenses charged in Counts 1-6 of this

Indictment, the United States intends to seek forfeiture of all property, real or

personal, involved in money laundering offenses or traceable to such property.

NOTICE OF CRIMINAL FORFEITURE

# NOTICE OF CRIMINAL FORFEITURE
## (28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C))

90.     Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to **JOSE LUIS DE JONGH ATENCIO** that in the event of his conviction of any of the offenses charged in Counts 7-10 of this Indictment, the United States intends to seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

## Property Subject to Forfeiture

91.     Defendant is notified that the property subject to forfeiture includes, but is not limited to, the following property:

a.  Commercial property located at 440 Cobia Drive in Katy, Texas, legally described as Units 201, 202, 203, 204, 303, and 304 of the Grand Ridge Office Condominium, Springfield Section 5 Partial Replat No. 2, a subdivision of Harris County, Texas

b.  Residential property legally described at Lot 26, Block 1, Towns at Seville Replat No. 1, a subdivision in Harris County, Texas

c.  Residential property legally described as Lot 7, Block 1, Towns at Seville Replat No. 1, a subdivision in Harris County, Texas

d.  Residential property legally described as Lot 20, Block 1, Towns at Seville Replat No. 1, a subdivision in Harris County, Texas

e.  Residential property legally described as Legacy at Cross Creek Ranch, Section 4, Block 1, Lot 20, in Fort Bend County, Texas

f.  Commercial property located at 20008 Champion Forest Drive, Building 3, Units 301-304 of the Champion Ridge Office Condominiums, Spring, Texas, in Harris County

g.  Residential property legally described as Condominium Parcel No. 703 of The Harbour North, a Condominium, as recorded in Official Records Book 31211, Page 3756 of the Public Records of Miami-Dade County, Florida

h.  $305,688.38 seized from funds on deposit at bank account held in the name of Relative 1 at Comerica Bank, with an account number ending in 6863 (referred to as Texas Account 2)

i.  $3,156.68 seized from funds on deposit at bank account held in the name of Relative 1 at Comerica Bank, with an account number ending in 7226 (referred to as Texas Account 1)

j.  $43,862.44 seized from funds on deposit at bank account held in the name of Associate 2 at Comerica Bank, with an account number ending in 6905 (referred to as Texas Account 4)

k.  Funds on deposit in two accounts (one in U.S. Dollars and one in Euros) at Union Bancaire Privee in Geneva, Switzerland, in the name of Shell Company C with a client number ending in 9341

## Money Judgment and Substitute Assets

92.     The United States gives notice that it will seek the imposition of a money judgment against Defendant.  In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of Defendant in substitution up to the amount of the money judgment.

A TRUE BILL

Original Signature on file
FOREPERSON

RYAN K. PATRICK
UNITED STATES ATTORNEY

BY: ROBERT S. JOHNSON
JOHN P. PEARSON
ASSISTANT UNITED STATES
ATTORNEYS

DANIEL S. KAHN
ACTING CHIEF, FRAUD
SECTION
CRIMINAL DIVISION
DEPARTMENT OF JUSTICE

BY: SARAH E. EDWARDS
SONALI D. PATEL
TRIAL ATTORNEYS