# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No.: 20-CR-00305-S-1 |
| | § | |
| JOSE LUIS DE JONGH ATENCIO | § | |

## GOVERNMENT'S TRIAL BRIEF

The United States of America, by and through its undersigned attorneys, hereby submits this trial brief, outlining the government's case and the legal elements of the crimes charged, and discussing the contested issues of (1) whether Citgo Petroleum Corporation ("Citgo") is an instrumentality as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15 U.S.C. § 78dd-1 *et seq.*, and (2) whether Citgo consented to Defendant's acceptance of bribes, in contravention of Citgo policies, for purposes of Texas's Commercial Bribery Statute ("TCBS"), Texas Penal Code § 32.43.

## I.    Introduction

On July 16, 2020, the grand jury returned a six-count indictment charging Defendant Jose Luis De Jongh Atencio ("De Jongh") with one count of conspiracy to launder money, in violation of 18 U.S.C. § 1956(h); four counts of concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); and one count of engaging in a monetary transaction in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957.  The indictment alleged that De Jongh promoted, and concealed the nature and purpose of the proceeds of, a specified unlawful activity, namely, bribery of a foreign official, a felony violation of the FCPA.  On December 16, 2020, the grand jury returned a superseding indictment charging De Jongh with four additional counts—one count of conspiring to violate the Travel Act, 18 U.S.C. § 1952, in violation of 18 U.S.C. § 371; and three counts of violating the Travel Act by using facilities in interstate commerce with the intent to promote, manage, establish, carry on, and distribute the proceeds of an unlawful activity, namely,

commercial bribery in violation of the laws of the State of Texas, Penal Code § 32.43, and thereafter performing and attempting to perform acts in furtherance of the bribery scheme. The superseding indictment also added the Travel Act, predicated on a violation of the Texas Commercial Bribery Statute, as a second specified unlawful activity, in addition to the FCPA violation, to the money laundering charges in Counts One through Six.

A bench trial will commence on March 22, 2021, and is expected to last approximately one week.

## II.     Summary of Anticipated Evidence

### A. Evolution of PDVSA and Citgo's Relationship to the Venezuelan State

De Jongh, a Venezuelan national, was employed by Citgo in Houston, Texas, between approximately 2010 and February 2018. De Jongh began his Citgo career as an attorney in its legal department, where he served as an assistant to the Chief Compliance Officer. In 2012 he moved to Citgo's procurement department, where he worked until 2015, when he moved back to the legal department but nonetheless remained involved with purchasing. While in procurement, he served for a time as the general manager of Citgo's Special Projects group, which was also referred to as the "Shareholder Procurement" group. The Special Projects group purchased goods and services for Petróleos de Venezuela, S.A. ("PDVSA"), Venezuela's state-owned and state-controlled oil company and Citgo's shareholder. Citgo, a Delaware corporation based in Houston, is a wholly-owned subsidiary of Citgo Holding, Inc., which is a wholly-owned subsidiary of PDV Holding, Inc., which in turn is a wholly-owned subsidiary of PDVSA, and therefore ultimately owned by the Venezuelan state. Citgo has long emphasized its close association with PDVSA and the Venezuelan government: a Venezuelan flag flies in front of Citgo's headquarters, and for years Citgo's website and official documents bore both PDVSA's and the Venezuelan government's logos.

Citgo was not always owned by Venezuela. The company that would become Citgo was founded in 1910 as the Cities Service Company. Meanwhile, across the Gulf of Mexico and the Caribbean Sea, oil was discovered in Venezuela and by approximately 1920 it was the country's primary export. While the oil and gas reserves in Venezuela have always been owned entirely by the Venezuelan state, the exploitation of oil in Venezuela was originally handled through government concessions to private corporations. During this time, the government obtained revenue from its oil resources by tax and royalty payments from the private companies.

In 1976, Venezuela nationalized its energy sector and founded PDVSA, which has been the state-owned and controlled oil company ever since. After nationalization, the divisions of various foreign oil companies that had been producing Venezuela's oil became subsidiaries of PDVSA, but they retained much of their management and technical staff, and they continued operations largely as before. Unlike many nationalized oil companies, at this time PDVSA acted as a holding company and its subsidiaries operated, by design, much as they had prior to being nationalized.

During the late 1980s and early 1990s, PDVSA began a program of "internationalization," investing in international assets and acquiring refining capacity for the crude oil produced through its exploration and production efforts in Venezuela. The increased refining capacity was especially important for PDVSA, because at the time there was limited refining capacity that could handle Venezuela's particular form of heavy, sulfurous crude oil, which undermined Venezuela's ability to sell its primary export at a consistent price and in large volumes. PDVSA therefore began to acquire refineries in the United States, including the three refineries that comprise a significant portion of Citgo's principal assets today. These three refineries could process heavy crude and provided guaranteed demand for PDVSA's oil. In the 1990s, PDVSA also reorganized internally: until that point, PDVSA had acted as a holding company for the various entities that were legacies of the pre-1976 foreign oil companies operating in Venezuela. As a result of this reorganization, PDVSA became

3

an operating company with components organized by function, rather than legacy ownership. After the purchase of international refining assets, including Citgo, PDVSA was a vertically integrated company with production and refining capabilities and retail sales. The purchase of Citgo, with refineries located in the United States, was especially important to PDVSA's internationalization strategy, because it gave PDVSA access to the United States market, where most of its oil products would ultimately be sold.

In the mid to late 1990s, PDVSA developed a plan referred to as "La Apertura Petróleo," whereby it allowed foreign companies to run production in Venezuela. It was during this time that several international oil companies entered into operating contracts with PDVSA. And a small number of international oil companies entered into association agreements with PDVSA, whereby they retained ownership of the oil they extracted. These operating contracts and association agreements were not universally popular. Indeed, in 1999, Hugo Chávez became President of Venezuela after running a campaign that railed against this opening up of the Venezuelan economy. Under Chávez, the Venezuelan government began to seize more operational control of PDVSA and its subsidiaries and extract an ever-increasing amount of financial resources from PDVSA in order to fund the state's ambitious foreign policy and domestic welfare goals. Chávez, and later Nicolas Maduro (who succeeded Chávez in 2013), installed regime loyalists—often from the Venezuelan military—in leadership positions at PDVSA and Citgo in place of the industry experts who had previously run the entities. In 2000, the Venezuelan government appointed a former military general named Oswaldo Contreras as Citgo's first Venezuelan CEO. Over time, an increasing number of Citgo managers whose primary qualification was loyalty to the remine were sent from Venezuela.

In late 2002, continuing into early 2003, PDVSA workers went on strike, partly in an attempt to force a new presidential election in Venezuela. PDVSA temporarily moved many Citgo workers to Venezuela to fill positions affected by the strike, which ultimately failed. In 2004, Citgo moved its

headquarters from Tulsa to Houston, and shortly thereafter a new leadership team of executives from Venezuela was put in place.  In 2005, Citgo became a one hundred percent net dividend company— after meeting minimum liquidity levels and debt-to-capital ratios required by its debt covenants, Citgo was required to pay out *all* remaining profits as dividends to be passed up the corporate chain to PDVSA and the Venezuelan government.

In 2006 Chávez embarked on "renationalization," renegotiating the operating contracts and association agreements with foreign oil companies entered into during "La Apertura Petróleo" to convert them to majority state-owned joint ventures.  Many companies, such as Exxon, elected to leave Venezuela and seek compensation through arbitration, a process that is still ongoing.

In addition to its original business of exploration, production, and refining of oil, the Chávez administration forced PDVSA to directly fund social programs in Venezuela, including programs to supply food and housing and increase literacy.  The Venezuelan Constitution enacted in 1999 provides that PDVSA is wholly owned by the Republic "[f]or reasons of economic and political sovereignty and national strategy" and notes that "the state will maintain the totality of the shares of PDVSA."[1] As stated in Citgo's website: as "the state oil company of the Bolivarian Republic of Venezuela," PDVSA's "main objectives" included "fostering the socio-economic development of Venezuela, guaranteeing sovereignty over its natural resources, and serving and benefitting the Venezuelan people."[2]

By approximately 2010, partly as a result of excess funds being extracted from PDVSA by the Venezuelan government and currency controls imposed by the government, PDVSA was strapped for cash and behind on payments to its own suppliers.  Previously, PDVSA had conducted its

---

[1] Constitution of the Bolivarian Republic of Venezuela, Article 303.

[2] Ex. 707.

purchasing through procurement subsidiaries, including Bariven S.A. in Venezuela and PDVSA Services, Inc. ("PSI")—like Citgo, another wholly owned U.S. corporate subsidiary operating in Houston.[3] But during this period, as it became increasingly cash poor and vendors became wary that PDVSA would not pay them, PDVSA turned to Citgo for its procurement needs. PDVSA arranged for Citgo to purchase goods and services at PDVSA's direction and would pay Citgo by offsetting the cost from the balance Citgo owed for shipments of crude oil that it purchased from PDVSA. At first this type of "special" procurement was conducted on an ad hoc basis. But, as PDVSA became more and more dependent on Citgo, the process was formalized, and the Special Projects group was created.

Although they were employed by Citgo, the mission of the employees in the Special Projects group was to buy things for Citgo's shareholder, PDVSA, and also for the Venezuelan state—hence the name, "Shareholder Procurement." Each purchase was made at the direction of PDVSA, and Citgo had no ability to say no. The Special Projects group purchased equipment used by PDVSA in oil production in Venezuela. But it also purchased a variety of goods for use in Venezuela that were completely unrelated to PDVSA's operations. At no point, however, did the Special Projects group purchase any goods or services for Citgo that could be used by Citgo in its U.S. refining business.

As PDVSA's cash further dwindled, the Venezuelan government looked to Citgo for continued financial support. In 2015 and 2016, when Nelson Martinez was the President of Citgo, Venezuela orchestrated a series of financial transactions to extract value from Citgo that could be paid as dividends up the corporate chain to PDVSA and ultimately on to the government. In 2015, Citgo Holding, Inc., a U.S. corporation and Citgo's immediate corporate parent, obtained a $1.3 billion

---

[3] This court has taken guilty pleas from several individuals who were employed by PSI, and who, like De Jongh, were employed by a wholly-owned PDVSA subsidiary incorporated in the United States, were involved in purchasing for PDVSA, and took bribes. Their guilty pleas to charges of conspiracy to commit money laundering were premised on the fact that PSI, a U.S. subsidiary, was an "instrumentality" of Venezuela, and they were "foreign officials" within the meaning of the FCPA. These individuals are: Jose Camacho, H-17-CR-394; Ivan Guedez, H-18-CR-611; Jose Luis Ramos, H-15-CR-636; Christian Maldonado, H-15-CR-635; Alfonzo Gravina, H-15-CR-637.

senior secured term loan and $1.5 billion in senior secured notes guaranteed with 100 percent of Citgo stock and other assets.  Of this, approximately $2.2 billion was sent up the corporate chain as a dividend to PDVSA, which ultimately went into state coffers.  Combined with Citgo's regular dividend for the year, Citgo's total dividend payment in 2015 was thus $2.56 billion.  This dividend was not insignificant: in 2015, Venezuela's gross domestic product ("GDP") was $122 billion, and government expenditures comprised 34 percent of GDP—this dividend thus amounted to 6.2 percent of government expenditures for that year.  Citgo Holding retained none of the funds generated by these transactions; everything but the small portion of the money that Citgo Holding was required to keep on hand pursuant to its credit agreements was sent to PDVSA.

Then, in 2016, PDVSA engaged in a bond swap involving Citgo to stave off holders of PDVSA bonds that were due in 2017 and that PDVSA would not be able to pay.  To forestall default, PDV Holding, a U.S. company wholly-owned by PDVSA whose principal asset was its shares of Citgo Holdings stock, pledged 50.1% of its Citgo Holding stock as collateral for new bonds that would come due in 2020.  Later in 2016, PDV Holding pledged the remaining 49.9% of its Citgo Holding stock to the Russian company Rosneft as collateral for a $1.2 billion dollar loan from Rosneft to PDVSA.  None of these financial arrangements inured to the benefit of Citgo and its U.S. business operations.

In January 2017, Nelson Martinez was appointed as the Venezuelan Minister of Oil and left his position at Citgo.  On April 26, 2017, Maduro appointed Jose Pereira as the Acting Chairman of Citgo through a Presidential decree that was published in the Official Gazette of the Bolivarian Republic of Venezuela.[4]  In November 2017, multiple Citgo executives, including Pereira, were summoned to Caracas, where they were arrested and detained on charges of corruption arising out of a Citgo financing transaction; the "Citgo 6" have since been sentenced to time in prison in Venezuela.

---

[4] Ex. 716.

On November 22, 2017, Maduro issued a Presidential decree appointing Asdrubal Chavez as the President of Citgo, which was again published in the Official Gazette.[5]  Approximately two months later, in February 2018, De Jongh was terminated by Citgo.  In January 2019, following Venezuela's 2018 presidential election, which was widely considered illegitimate, Juan Guaidó declared himself the interim President of Venezuela.  The Guaidó government has been recognized by dozens of countries, including by the United States, as the legitimate government of Venezuela.  There are currently two Boards of Directors for PDVSA and Citgo—one appointed by President Maduro and one appointed by President Guaidó.  President Maduro remains in power in Venezuela, and in control of PDVSA. PDVSA's U.S. subsidiaries, including Citgo, are controlled by the ad hoc Administrative Board of PDVSA, appointed by President Guaidó.

### B.  De Jongh's Corrupt Tenure at Citgo

#### 1.  De Jongh's Receipt of Bribes and Laundering of Bribe Proceeds

De Jongh began working in the Special Projects group in 2012 and for a time became the manager of that group.  Between 2013 and 2017, he accepted at least 32 bribe payments totaling $2,737,679.96 into offshore accounts in Panama and Switzerland from two Citgo suppliers, Jose Manuel Gonzalez Testino ("Gonzalez") and Tulio Anibal Farias Perez ("Farias").[6]  In addition to the

---

[5] Ex. 717.

[6] Five of these payments were made in Euros, not U.S. Dollars.  To convert all of the payments into dollars and reach a single total amount, the government used the historical EUR to USD exchange rate on the date each of the payments was made according to the Federal Reserve.  Historical rates available at: https://www.federalreserve.gov/releases/H10/Hist/dat00_eu.htm.

| Date | Payment Amount | Historical Conversion Rate | Payment in USD |
|---|---|---|---|
| Feb. 6, 2015 | €347,826.00 | €1 = $1.1330 | $394,086.86 |
| July 15, 2015 | €22,730.00 | €1 = $1.0965 | $24,923.45 |
| Aug. 17, 2015 | €22,522.00 | €1 = $1.1078 | $24,949.87 |
| Feb. 3, 2016 | €133,000.00 | €1 = $1.1051 | $146,978.30 |
| May 19, 2016 | €25,630.00 | €1 = $1.1214 | $28,741.48 |

payments, De Jongh accepted gifts and other things of value from Gonzalez and Farias, such as an interest in a commercial real estate venture; travel and tickets to sporting events, including a 2014 World Series game and the 2015 Super Bowl; and tickets to a 2017 U2 concert.  De Jongh also accepted more than $3 million in bribe payments from other vendors who sold goods and services to Citgo.

In exchange for the payments, De Jongh assisted Gonzalez, Farias, and their U.S.-based businesses, including Petroleum Logistics Service USA ("Petroleum Logistics") and SGL Technic, in obtaining and retaining business with Citgo's Special Projects group.  Specifically, De Jongh assisted SGL Technic in winning contracts to provide electric submersible pumps to the Special Projects group and assisted Petroleum Logistics in winning a contract to provide the Special Projects group with logistics services.  De Jongh regularly communicated with Gonzalez and his right hand, an individual identified as "Employee A" in the superseding indictment, frequently about Petroleum Logistics and the bribe payments due to him, even reviewing at their request Petroleum Logistics documents prior to submission to Citgo.

The Special Projects group overseen by De Jongh procured a variety of oil and gas-related equipment, such as the pumps purchased from SGL Technic, on PDVSA's behalf for use in oil production in Venezuela.  But it also procured other items at PDVSA's direction that were not related to the oil industry—school supplies, toys for children at Christmas, spray paint for an Urban Murals Project, armored cars, and astroturf.  It even purchased desalination plants, for the purpose of ensuring that coastal communities in Venezuela had potable water.  Through these procurements at PDVSA's done at PDVSA's direction, Citgo assisted in providing services to the Venezuelan people.  Petroleum Logistics handled the logistics for several such contracts for the Special Projects group, and Employee A tracked the bribes owed to De Jongh for each of them.

2.   De Jongh's Efforts to Conceal the Bribe Payments

De Jongh, Gonzalez, Farias, and Employee A worked together to conceal the bribery scheme. De Jongh did not communicate about the scheme using his Citgo email account.  Instead, Gonzalez sent payment confirmations to De Jongh at an email address, ayer2020@gmail.com, that was not linked to De Jongh's name, and typically referred to De Jongh by a nickname, usually "Ayer" or "Tocayo," in his email communications with De Jongh.  Employee A and Farias also communicated with De Jongh using this account.  And Gonzalez gave De Jongh a cellphone to use when they discussed the bribery scheme.  In addition to taking steps to hide his communications about the scheme, De Jongh went to great lengths to conceal his receipt of bribes.  The payments themselves were usually sent to offshore accounts—first in Panama, and then, when De Jongh's accounts were outed by the Venezuelan press, to Switzerland—in the names of corporate entities.[7]  In addition, De Jongh, Gonzalez, and Farias worked together to create fake invoices in the name of Seahouse Commercial, the corporate entity De Jongh used to receive bribe payments in Switzerland, to justify the payments into the account.  When Gonzalez and De Jongh purchased commercial real estate together—De Jongh contributed $120,000 of his bribe proceeds from SGL Technic, and Gonzalez arranged for his uncle to provide the remaining $1.38 million—the corporate entity that bought the real estate, D&H Service Group, was owned, at least on paper, by relatives of De Jongh and Gonzalez, and De Jongh's wife coordinated the transaction.

De Jongh continued to take steps to conceal the bribes even after he received the payments in his offshore accounts in Panama and Switzerland.  To access the payments, De Jongh conducted additional financial transactions, laundering the bribe proceeds by sending them through other accounts and back into the United States, often to purchase real estate in the Southern District of

---

[7] In 2015, after the details of his Panamanian accounts were reported by the Venezuelan press, De Jongh was transferred to Citgo's legal department.  He nonetheless continued to provide assistance to Gonzalez, Farias, and their companies.

Texas.  For example, Gonzalez and Farias sent at least $675,000 to De Jongh's Panamanian account in the name of Inversiones J&J, a shell company De Jongh controlled.  De Jongh then transferred those funds to a second Panamanian account in the name of an entity called Kaipara 7, before sending them to an account identified as Texas Account 4 in the Superseding Indictment.  Texas Account 4 is an account in the name of Eney Socorro, a relative of De Jongh.  De Jongh caused the funds to be transferred yet again, from the account in Socorro's name to an account in the United States in his mother's name, before using the proceeds to purchase a home in his own name in the Southern District of Texas.  Funds from the Seahouse Commercial account, in Switzerland, were also laundered into the United States and through several accounts, before some of it was used to purchase additional real estate or sent to accounts in De Jongh's own name.

De Jongh's  acceptance of bribes was prohibited by Citgo's policies.  Citgo's Business Ethics and Conflict of Interest Policy required Citgo employees to, among other things, avoid "any interest or association which would, or might appear to, influence or interfere with the independent exercise of his or her judgment in the best interest of the Company." [8]  Citgo was particularly mindful of the risks associated with procurement, and barred its employees, "particularly [ ] employees who buy or sell, or have any control or supervision over buying or selling, on behalf of the Company," from having "any material financial interest in, or engag[ing] in any material business venture or transaction with any business or concern which is a supplier or contractor of the Company." [9]  Citgo employees were likewise prohibited from accepting gifts or favors, other than of nominal value, or trips, from suppliers.

---

[8] Exs. 230 and 237, Citgo's Business Ethics and Conflict of Interest Policy, Sections 4.1 and 4.2.  Ex. 237 is the version of the policy dated 2004 and Ex. 230 is the version of the policy dated 2015; the quoted language is the same in both versions of the policy.

[9] Exs. 230 and 237, Section 5.1.

Certain Citgo employees, including De Jongh, were required to certify on an annual basis that they had read and understood Citgo's Business Ethics and Conflicts of Interest Policy and that they had complied with the policy—including that they had not accepted any gifts or benefits from any suppliers, and did not have any ownership interest, direct or indirect, in a company that served as a Citgo supplier.  Beginning in 2010 and continuing through his employment at Citgo, De Jongh completed such certifications.  In these certifications, De Jongh falsely denied that he had received commissions, payments, gifts, or benefits from Citgo suppliers.

The acceptance of bribes was also forbidden by Citgo's Anti-Fraud Policy, which prohibits employees from taking actions—or failing to take actions—with the intention of obtaining an unauthorized benefit.  And in 2017, when Citgo adopted additional policies, including an Anti-Corruption Policy, that were intended to clarify its existing Anti-Fraud Policy, it defined "government official" as "any officer or employee of a company or business owned or controlled in whole or in part by a government" and lists PDVSA as an example of a business owned and controlled by a government.[10]

Today, De Jongh lives in a million-dollar residence in the Southern District of Texas that he bought with proceeds of the bribery scheme.  He also owns a luxury condominium in Miami and three townhomes and ten commercial office suites in the Houston area from which he continues to collect rent—all purchased with proceeds of the bribery scheme.  More than $3 million dollars in bribe proceeds remain frozen in his Swiss bank account in the name of Seahouse Commercial.

## III.    Disputed Legal Issues

De Jongh has been charged with conspiring to launder money and to violate the Travel Act as well as substantive bribery and money laundering offenses.  The bribery charges against De Jongh are

---

[10] Ex. 228, section 4.4.3.

based on violations of the Travel Act, predicated on violations of the Texas Commercial Bribery Statute.  The substantive money laundering charges against De Jongh arise out of the bribery scheme and are based on De Jongh's actions in concealing and spending the proceeds of two specified unlawful activities: violations of the FCPA and the Travel Act.

De Jongh has stipulated to facts that, he agrees, constitute proof beyond a reasonable doubt of the elements of each of the charges against him, with two exceptions:[11]

(1) With respect to Counts One through Six, De Jongh disputes that Citgo was an instrumentality of a foreign government and that De Jongh was a foreign official, within the meaning of the FCPA, and further disputes that he knew or believed that Citgo was an instrumentality, and knew or believed that he was a foreign official.

(2) With respect to Counts One through Ten, De Jongh disputes that he acted without Citgo's consent in accepting the bribe payments and other things of value from Gonzalez and Farias, as required by the TCBS, and further disputes that he knew or believed he acted without Citgo's consent in accepting the bribe payments and other things of value.

Dkt. No. 61, Ex. 803 at ¶ 1.  Defendant's stipulations suggest that both factual questions regarding instrumentality, and his subjective knowledge and belief about instrumentality, are elements of each of counts 1 through 6, and that both factual questions regarding consent, and his subjective knowledge and belief about consent, are elements of each of counts 1 through 10.  This is incorrect.

### A.   De Jongh's Knowledge or Belief with Respect to Instrumentality and Consent is not an Element of the Charged Offenses.

#### 1.   Money Laundering Offenses

***Conspiring to Launder Money (Count 1).***  De Jongh is charged in Count 1 with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  There are two objects to the charged conspiracy—concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and

---

[11] Because of the stipulation reached by the parties, the government has discussed only the disputed elements here.  The full elements of the offenses charged in the superseding indictment are set forth in Exhibit 1 to this brief for the Court's reference.

international promotion money laundering, in violation of 18 U.S.C. § 1956(a)(2)(A). To establish conspiracy to commit money laundering, the government must prove "(1) that there was an agreement between two or more persons to commit money laundering and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose." *United States v. Cessa*, 785 F.3d 165, 173 (5th Cir. 2015). In a multi-object conspiracy, the government need only prove one object. *See United States v. Fuchs*, 467 F.3d 889, 906 (5th Cir. 2006) ("Even if there was insufficient evidence as to one of the objects of the conspiracy, we will nonetheless uphold the conspiracy conviction if there was sufficient evidence as to the other object."). "Direct evidence of a conspiracy is unnecessary; each element may be inferred from circumstantial evidence. . . . An agreement may be inferred from a 'concert of action.'" *Id.* Furthermore, with respect to the first object of the charged conspiracy, "[a] conviction under § 1956(h) does not require proof of the elements of the substantive offense under section 1956(a)(1)." Fifth Circuit Pattern Jury Instructions (Criminal) 2.76A Note, *citing United States v. Threadgill*, 172 F.3d 357, 367 (5th Cir. 1999) (explaining that "[i]t is settled law that conspiring to commit a crime is an offense wholly separate from the crime which is the object of the conspiracy.").

Thus, to prove a conspiracy under Section 1956(h), the government need not prove lack of consent by Citgo to the bribery or that Citgo was an instrumentality of Venezuela, or that De Jongh knew either of those things. These facts are not elements of the crime of conspiracy. What the government must prove is De Jongh's intent to "further the illegal purpose" of the conspiracy. Regarding intent, "[c]onspiracy to commit money laundering does not require that the defendant know exactly what 'unlawful activity' generated the proceeds. . . . Rather, the knowledge element is satisfied where the defendant acts with knowledge that the transaction involves profits of unlawful activity." *United States v. Rivas-Estrada*, 761 F. Appx. 318, 326 (5th Cir. 2019) (unpublished) (internal citations omitted).

In *Rivas-Estrada*, two defendants were acquitted by a jury of the substantive offense of drug trafficking but were convicted of participating in conspiracy to launder drug trafficking proceeds. On appeal, both defendants, who had been trained to identify money laundering as part of their employment, argued that because they were not involved in drug trafficking, they could not have known they were laundering the proceeds of drug trafficking or that the transactions were designed to conceal the nature or source of those proceeds. *Rivas-Estrada*, 716 F. Appx. at 326-27. With respect to the first defendant, the court disagreed, and explained that "[p]eople engaged in legitimate transactions generally do not . . . structure transactions . . . and send wires to the same recipients in a methamphetamine hot spot day after day." *Id.* at 326. According to the court, the defendant "did not have to be involved in drug trafficking herself to know that transactions riddled with red flags involved proceeds of unlawful activity." *Id.* Thus, the court held that the evidence supported her conviction because her actions, including obscuring the source and destination of the money, were "designed to promote the underlying unlawful activity even if she did not know exactly what that was." *Id.* The court similarly upheld the conviction of the second defendant, noting that, at the very least, she had been "willfully blind to the unlawful nature of her conduct" and that, "tellingly, [she] did not put a stop to the suspicious transactions even when federal agents informed her money laundering was taking place at her business." *Id.* at 327.

***Substantive Money Laundering (Counts 2-6).*** With respect to the substantive money laundering counts, to prove a violation of concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove, in relevant part, that (1) the defendant conducted or attempted a financial transaction, (2) the transaction involved the proceeds of a specified unlawful activity, in this case a violation of the FCPA or the Travel Act, (3) which he knew involved proceeds arising from some form of unlawful activity, (4) with the knowledge that the transaction's design was to conceal or disguise the nature or source of the illegal proceeds. *See* Fifth Circuit Pattern Jury

Instruction (Criminal) 2.76A; *United States v. Pennel*, 409 F.3d 240, 243 (5th Cir. 2005). Similarly, a violation of Section 1957 consists of three elements: (1) property valued at more than $10,000 that was derived from a specified unlawful activity, (2) the defendant's engagement in a financial transaction with the property, and (3) the defendant's knowledge that the property was derived from unlawful activity. *United States v. Fuchs*, 467 F.3d 889, 907 (5th Cir. 2006).

Section 1956 is written broadly to require only that the defendant knew the money laundering transaction involved proceeds "arising from *some form of unlawful activity*." *See United States v. Ogle*, 328 F.3d 182, 188 n.3 (5th Cir. 2003) ("A conviction for money laundering does not require that the defendant know the precise source of the illegal funds, but only that the defendant know that the funds are 'proceeds of *some form of illegal activity*.'") (emphasis in original) (quoting 18 U.S.C. § 1956(a)(1)). The term "knowing that the property involved financial transaction represents the proceeds of some form of unlawful activity," as used in Section 1956(a)(1) "means that the person knew the property involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is specified in paragraph (7)." 18 U.S.C. § 1956(c)(1).[12] Thus, "some form of unlawful activity" in Section 1956(a)(1) is not limited to the two charged specified unlawful activities. Similarly, "[i]n a prosecution for an offense under [ ] section [1957], the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity." 18 U.S.C. §1957(c); *United States v. Pettigrew*, 77 F.3d 1500, 1513 (5th Cir. 1996) ("The knowledge element of the offense requires that the

---

[12] This is consistent with Congressional intent. The Senate Report on the Money Laundering Control Act of 1986, which codified the money laundering statutes under which De Jongh is charged, explains that "the defendant need not know exactly what crime generated the funds in a transaction, only that the funds are the proceeds of some kind of crime that is a felony under Federal or State law. This will eviscerate the defense that a defendant knew the funds came from a crime, but thought the crime involved was not on the list of 'specified crimes in section (c)(7)." S. Rep No. 99-433 at 12 (1986).

defendant know that the property in question is 'criminally derived,' although it does not require knowledge that the property was derived from 'specified unlawful activity.'")

For both charged substantive money laundering crimes, De Jongh disputes that the money moving through his accounts was in fact derived from specified unlawful activity—either an FCPA violation or a Travel Act violation—and that he knew it was derived from those specified unlawful activities. The government does not dispute that for both charged offenses, it is required to prove beyond a reasonable doubt that the charged transactions were the proceeds of or derived from a specified unlawful activity. However, the government is not required to prove that De Jongh *knew* that the transactions involved the proceeds of the charged specified unlawful activity. As the jury instructions make clear, the government is required to prove only that De Jongh knew that the transactions involved the proceeds of or were derived from *some form of unlawful activity*.

De Jongh's receipt of bribes could have been the result of any number of federal or state crimes—they could have been based on an honest services fraud violation, or a wire fraud violation, or embezzlement. To be guilty of money laundering, the government is not required to prove De Jongh knew that a particular statute was violated. The government need only prove—by circumstantial or direct evidence—that De Jongh knew the money he was laundering was criminally derived. Moving the money through offshore accounts, with financial layering, using fraudulent invoices, and employing nominees and shell companies before repatriating the money and spending it, all of which De Jongh admits, is strong circumstantial evidence that De Jongh knew the money was "dirty" because it was criminally derived. As the Supreme Court has explained, "the knowledge element of the money-laundering offense—knowledge that the transaction involves profits of unlawful activity—[is] provable (as knowledge must almost always be proved) by circumstantial evidence." *United States v. Santos,* 553 U.S. 507, 521 (2008); *Cessa*, 785 F.3d at 174. Therefore, whether he believed that Citgo was an instrumentality, that he was a foreign official, or that Citgo consented

17

to his receipt of bribes is not determinative—his belief is simply not an element of Sections 1956(a)(1)(B)(i) or 1957.

2.     Travel Act and Bribery Offenses

To prove a violation of the Travel Act, the government must show, in relevant part, (1) that the defendant used a facility in interstate commerce; (2) with the specific intent to promote, manage, establish, or carry on . . . unlawful activity; and (3) that he committed a knowing and willful act in furtherance of that intent, subsequent to the use of the facility in interstate commerce. *See U.S. v. Bams*, 858 F.3d 937, 946 (5th Cir. 2017). The "unlawful activity" alleged in this case is commercial bribery, in violation of the Texas Commercial Bribery Statue. Under that statute, "[a] person who is a fiduciary commits the offense of commercial bribery if, without the consent of his beneficiary, he intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary." Tex. Penal Code Ann. § 32.43 (West 2019). "Beneficiary" means a person for whom a fiduciary is acting, and "fiduciary" includes "an agent or employee." *Id.*

De Jongh contends he accepted bribes with the consent of Citgo or that he believed he acted with Citgo's consent. Whether or not Citgo consented to the bribery is an element of Texas's commercial bribery statute. But, as discussed in detail below, under the plain language of that statute, what De Jongh *knew or believed* about that consent or lack thereof is not. *See United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004) ("The starting point for interpreting a statute is the language of the statute itself."). Therefore, for the substantive Travel Act counts, the factual question for the Court to determine is whether Citgo consented to De Jongh's extensive bribe taking.

Nor is the government required to prove De Jongh's knowledge of consent with respect to the Travel Act conspiracy charged in Count 7. "The essential elements of conspiracy are an agreement between two or more people to commit a crime and an overt act done in furtherance of the

agreement." *United States v. Holcomb*, 797 F.2d 1320, 1327 (5th Cir. 1986). "Because it is difficult to present direct evidence of an agreement, however, its existence may be implied by circumstantial evidence." *Id.* "To establish one's guilt as a conspirator, therefore, the Government need only present some evidence suggesting his knowing agreement to violate federal law." *Id.* "The government must prove the same degree of criminal intent as is necessary for proof of the underlying substantive offense." *United States v. Peterson*, 244 F.3d 385, 389 (5th Cir. 2001); *United States v. Massey*, 827 F.2d 995, 1001 (5th Cir. 1987) ("Conspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself."). As discussed below, the fiduciary's knowledge of Citgo's lack of consent is not required for a Travel Act/TCBS violation. Therefore, that knowledge is not required for a conspiracy to violate the Travel Act/TCBS.

### B. Citgo Is An Instrumentality of Venezuela, and De Jongh was Therefore a Foreign Official.

The FCPA prohibits, among other things, any "domestic concern" from using means of interstate commerce "corruptly in furtherance" of a an offer, promise, or payment or other thing of value to "any foreign official" for the purpose of "influencing any act or decision of such foreign official . . . in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person. 15 U.S.C. § 78dd-2(a)(1), (3). The definition of "foreign official" includes "any officer or employee of a foreign government or any department, agency, or instrumentality thereof." *Id.* § 78dd-2(h)(2)(A).

The FCPA does not define the term "instrumentality," but in *United States v. Esquenazi*, 752 F.3d 912 (11th Cir. 2014), the Eleventh Circuit considered the question. The *Esquenazi* defendants were convicted of conspiracy to violate the FCPA, conspiracy to launder money, and substantive FCPA violations, among other offenses. Like De Jongh, the defendants argued that Telecommunications D'Haiti, S.A.M. ("Teleco"), the Haitian state-owned phone company, was not an instrumentality of the Haitian government despite extensive evidence to the contrary presented by

the government.  One of the defendants, like De Jongh, had admitted his conduct—there the payment of bribes to Teleco officials—but nonetheless pleaded not guilty and proceeded to trial.  752 F.3d at 916-19.  Both defendants challenged the sufficiency of the evidence with respect to whether Teleco was an instrumentality.  Before addressing this challenge, the court first considered the plain language and the legislative history of the FCPA to formulate a definition of instrumentality.  *Id.* at 920-25.

The court held that "[a]n 'instrumentality' under section 78dd-2(h)(2)(A) of the FCPA is an entity controlled by the government of a foreign country that performs a function the controlling government treats as its own."  752 F.3d at 925.  The court further explained that "what constitutes control and what constitutes a function the government treats as its own are fact-bound questions." *Id.*  The court provided a list of "some factors" relevant to deciding whether an entity is an instrumentality, making clear that it did "not purport to list *all* of the factors that might prove relevant to deciding whether an entity is an instrumentality of a foreign government."  *Id.* (emphasis added). With respect to whether a government "controls" an entity, courts should

> look to the foreign government's formal designation of that entity; whether the government has a majority interest in the entity; the government's ability to hire and fire the entity's principals; the extent to which the entity's profits, if any, go directly into the governmental fisc, and, by the same token, the extent to which the government funds the entity if it fails to break even; and the length of time these indicia have existed.

752 F.3d at 925.  The court looked to the Organization for Economic Cooperation and Development's Convention on Combatting Bribery of Foreign Public Officials in International Business Transactions ("OECD Convention") and Supreme Court cases relating to whether a domestic entity was an instrumentality in delineating these non-exhaustive factors.  *Id.* at 925-26 ("[a]n entity is 'deemed' to be under governmental control '*inter alia*, when the government or governments hold the majority of the enterprise's subscribed capital, control the majority of votes attaching to shares issued by the enterprise or can appoint a majority of the members of the enterprise's administrative or managerial body or supervisory board.'") (citing OECD Convention, art. 1.4, cmt. 14).

With respect to whether the entity performs "a 'function the government treats as its own,'" courts should consider

> whether the entity has a monopoly over the function it exists to carry out; whether the government subsidizes the costs associated with the entity providing services; whether the entity provides services to the public at large in the foreign country; and whether the public and the government of that country generally perceive the entity to be performing a governmental function.

*Id.* at 926. Similarly, the court looked to the OECD Convention and Supreme Court jurisprudence to decide these factors. *Id.* (the OECD explained that a "'public entity shall be deemed to perform a public function,' if it does not 'operate[] on a normal commercial basis in the relevant market, *i.e.*, on a basis which is substantially equivalent to that of a private enterprise, without preferential subsidies or other privileges'" and defined "public function" as "any activity in the public interest, delegated by a foreign country").

De Jongh contends that Citgo is not an instrumentality of the Venezuelan government; however, his contention is belied by extensive evidence to the contrary that the government will present at trial. Citgo is a wholly-owned subsidiary of PDVSA, the Venezuelan state-owned and state-controlled oil company. The Venezuelan State, which owns all hydrocarbon reserves in Venezuela, exercises its monopoly rights over petroleum through PDVSA, which controls all petroleum operations in Venezuela. PDVSA's main objectives are "fostering the socio-economic development of Venezuela, guaranteeing sovereignty over its natural resources, and serving and benefitting the Venezuelan people."[13]

As explained in more detail above, beginning in the 1980s, PDVSA embarked on a project of internationalization, whereby it sought to vertically integrate by increasing its refining capacity through the purchase of international assets, including the three refineries that today comprise Citgo Petroleum Corporation. Shortly after Hugo Chávez was elected as the President of Venezuela, PDVSA began

---

[13] Exs. 707, 708, 709.

selecting the senior management at Citgo.   When PDVSA workers went on strike in 2002 and into 2003, Citgo workers at all levels were sent to Venezuela to fill the positions of the striking workers. And since 2005, when PDVSA determined that it was not deriving enough value from its overseas assets, Citgo has been a one hundred percent net dividend company, meaning that apart from cash that it is required to keep on hand pursuant to various credit agreements, it sends all of its profits back to PDVSA, its ultimate shareholder.  The money sent as dividends by Citgo to PDVSA is then used to fund social programs in Venezuela, which is one of PDVSA's main objectives.

Citgo, moreover, did not just fund these objectives through the dividends that it paid to PDVSA; during the pendency of the charged conspiracies, Citgo was also directly involved in funding the prerogatives of PDVSA and the Venezuelan state through its Special Projects group, where De Jongh was employed from 2012 to 2015.  This included purchasing toys and school supplies for Venezuelan children and water desalinization plants for coastal communities in Venezuela, and making payments for consultants and lawyers who worked to promote the interests of the Venezuelan government.  And, in 2015, Citgo was pledged as collateral for a series of financing arrangements, orchestrated by Venezuela, by which it borrowed $2.8 billion, $2.2 billion of which was paid as dividends up the corporate chain to PDVSA and ultimately, the Venezuelan government.

The government will present evidence at trial that the President of PDVSA and the board of directors are appointed by the President of Venezuela.  The Board of Directors of the holding companies through which Citgo is owned, and of Citgo itself, is appointed by PDVSA, as is the senior leadership.  These appointments are often made at the direction of the President of Venezuela and, more recently, have been published in the Venezuelan National Gazette.[14]  Indeed, during the time that De Jongh was employed at Citgo, two of the company's presidents—Nelson Martinez and Jose Pereira—were appointed by Nicolas Maduro.  Citgo executives have been recalled to Venezuela and

---

[14] Exs. 716, 717.

prosecuted for failing to secure the approval of President Maduro to enter into financing, and more generally, for taking actions in a business context deemed to be harmful to the Venezuelan State.

Given the extensive evidence of both control and function that the government will present at trial, Citgo is unquestionably an instrumentality. A federal jury sitting in the District Court for the District of Maryland recently came to a similar conclusion regarding a U.S.-based corporate subsidiary of the Russian governmental entity responsible for managing uranium for the Russian government. *See United States v. Lambert*, No. 18-cr-12, Jury Verdict, DE 176 (Nov. 22, 2019).

De Jongh also attempts to add an element to the charged money laundering offenses, claiming that he did not know or believe that Citgo was an instrumentality or that he was a foreign official. As an initial matter, the evidence presented at trial will demonstrate that De Jongh knew that Citgo was purchasing items for PDVSA and Venezuela, that Citgo officials were appointed by the Venezuelan government, and worked in a building that flew the Venezuelan flag at the entrance. Furthermore, De Jongh went to great lengths to ensure that bribe money was never directly transferred to an account in his name. He subsequently engaged in several downstream transactions that hid his true ownership of the funds. This was not out of some need for privacy, but because he knew that he was laundering illicit funds.

But notwithstanding such evidence, De Jongh's purported defense still fails because knowledge or belief is simply not an element of the FCPA. The FCPA requires that the bribe payor make a payment to a foreign official for a specific, enumerated purpose. It does not require that the foreign official know or believe himself to be a foreign official. This is consistent with the fact that the bribe-receiving foreign official cannot be prosecuted under the FCPA. *See United States v. Castle*, 925 F.2d 831, 832 (5th Cir. 1991). Thus, if De Jongh is a foreign official because Citgo is an instrumentality, which the government submits he is, and Gonzalez, Farias, and others made use of the mails or any means or instrumentality of interstate or foreign commerce to corruptly offer,

promise, or pay him anything of value to influence any act or decision by De Jongh in his official capacity in order to obtain or retain business, then they violated the FCPA, regardless of whether De Jongh thought he was a foreign official.  Nor, for the reasons explained above, is De Jongh's knowledge or belief an element of the substantive money laundering offenses or the money laundering conspiracy with which De Jongh has been charged.

The evidence that the government intends to present relating to control and function both meets the test set forth in *Esquenazi* and is consistent with the reality of Citgo's relationship with PDVSA and the Venezuelan State.

### C. Citgo Did Not Consent to De Jongh's Receipt of Bribe Payments from Suppliers.

De Jongh would have this Court believe that Citgo consented to his acceptance of millions of dollars in bribe payments, in addition to the real estate, sports tickets, and concert tickets, in exchange for which De Jongh provided assistance to Citgo's suppliers, and that Citgo did so to its own detriment.  The assertion is incredible on its face.  As a threshold matter, De Jongh's knowledge with respect to Citgo's consent is not an element the government must prove under the TCBS.  Regardless, the evidence at trial will demonstrate that De Jongh did act, and knew he acted, without Citgo's consent.  De Jongh's apparent attempt to raise a mistake of fact defense by claiming that he did not "know or believe" that he acted without Citgo's consent cannot succeed on the anticipated evidence. *See* Tex. Penal Code Ann. § 8.02 (West 2019) ("It is a defense to prosecution that the actor through mistake formed a *reasonable* belief about a matter of fact if his mistaken belief negated the kind of culpability required for the commission of the offense.") (emphasis added).  The ample evidence that De Jongh took numerous steps to conceal his receipt of bribes—including from Citgo—shows that De Jongh knew Citgo did not consent to his conduct.  Moreover, where, as here, the defendant has repeatedly confirmed in writing that he was aware of his employer's policies forbidding the acceptance of bribes, and falsely stated that he was following such policies, a mistake of fact defense as to the

defendant's knowledge or belief fails.  In the face of this evidence, De Jongh cannot possibly establish that he had a "reasonable" belief that Citgo has consented to his bribery.

1.  <u>Under the Texas Commercial Bribery Statute, It Is the Beneficiary's Knowledge of Consent That Is Relevant.</u>

It is Citgo's knowledge of De Jongh's bribes, not De Jongh's knowledge of Citgo's consent, that is required under the TCBS.  The TCBS provides that:

> A person who is a fiduciary commits an offense if, without the consent of his beneficiary, he intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary.

Tex. Penal Code § 32.43(b).  The Texas Penal Code further defines a fiduciary as an employee of his employer.  *Id.* at § 32.43(a)(2).  Thus, the TCBS has three elements: (1) that an employee intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person, (2) on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his employer, and (3) that he does so without the consent of his employer.  The government is required to prove the employee's mental state with respect to the first two—only the employer's knowledge is at issue in the third.

Looking to the text of the statute, with respect to the first element, the requirement that the employee act "intentionally or knowingly" applies to the *action* that is prohibited: the solicitation, acceptance, or agreement to accept a bribe.  The grammatical choices the legislature made in this instance makes this clear, as the adverbs "intentionally" and "knowingly" modify the verbs "solicit[ ], accept[ ], or agrees to accept[ ]."  In this instance, not only is the consent requirement offset in a separate clause dealing with the employer rather than the employee, but the word consent is also used as a noun that would not be modified by an adverb.

Moreover, in addition to specifying that the employee must intentionally or knowingly solicit or accept the benefit, the legislature specified in the second element that the employee must accept

25

the bribe on the "agreement or understanding" that the benefit will influence the employee's conduct. Again, this "agreement or understanding" is related to the employee's intended actions, and not his employer's consent.    Therefore, there are two *mens rea* requirements with respect to the employee/fiduciary under the commercial bribery law.  The fiduciary must (1) intentionally or knowingly take one of three actions—solicit, accept, or agree to accept a bribe—and, (2), at the same time, have the agreement or understanding that in exchange for the bribe the employee will be influenced in his conduct on behalf of his employer.

While the statutory language is clear, the legislative history of the TCBS shows that the consent clause was intended to address the beneficiary's, and not the fiduciary's, knowledge.  Prior to 1983, the TCBS did not have an element addressing whether the beneficiary consented to the bribery.  *See Ex parte Mattox*, 683 S.W.2d 93, 96-97 (Tex. Ct. App. 1984); 1983 Tex. Gen. Laws 1942 (attached hereto as Exhibit 2).  This earlier version of the statute provided that "a fiduciary commits an offense if he intentionally or knowingly solicits, accepts, or agrees to accept any benefit as consideration for (1) violating a duty to a beneficiary; or (2) otherwise causing harm to a beneficiary by act or omission." In 1983, the Texas legislature made two changes to the commercial bribery law.  It substituted "from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of the beneficiary," for "as consideration for . . ." and the two subdivisions that followed.  1983 Tex. Gen. Laws 1942.  And it added the clause "without the consent of the beneficiary" at the beginning of the statute.  *Id.*

The insertion of the clause "without the consent of the beneficiary" adds an element that relates to the knowledge of the employer/beneficiary.  As explained in the Texas House's Committee Report, the amendments to the commercial bribery statute were motivated by a concern that the law, because it required a violation of a duty or some other harm to the beneficiary, "allow[ed] a fiduciary to take a bribe and get away with it in some cases."  Texas House of Representatives, Criminal

Jurisprudence Committee, Study Group Bill Analysis of HB-2353, 68th Reg. Sess. Ch. 357, at 33-34 (1983) (attached hereto as Exhibit 3).  The legislature gave the example of a hypothetical purchasing agent who accepted a kickback, but also obtained the lowest price for a good, as bribery that was not criminalized under the pre-1983 statutory language but would be covered under the amended statute. *Id.*  The committee explained that it wished to close the loophole because "that purchasing agent has violated the trust relationship with his employer and should be prosecuted."  *Id.*  As the committee noted, "[i]t may be okay with some beneficiary for the fiduciary to receive an extra fee-for-service from another party; but the beneficiary is entitled to know about it." *Id.*[15]

Of course in the vast majority of cases brought under this statute, like this one, the employee will be well aware that his employer does not consent to the bribery.  But that common fact pattern does not create a fourth element where the legislature has enacted only three.  De Jongh's assertion that his knowledge or belief with respect to Citgo's lack of consent is an element of the statute should be rejected.

### 2. Citgo Explicitly Forbade Its Employees from Accepting Bribes.

Citgo, De Jongh's beneficiary, did not consent to his receipt of bribes.  As detailed above, Citgo had explicit policies forbidding its employees from accepting commissions, payments, gifts, or benefits from suppliers.  At trial, the government will offer these policies into evidence and Citgo

---

[15] The government notes that, unlike the bribe recipient, the bribe payor does need to act with knowledge that the beneficiary does not consent to the payment of bribes.  This additional knowledge element makes sense for the bribe payor, an individual who does not owe a fiduciary duty to the beneficiary.  *See Weightman v. State*, Nos. 14-93-01094-CR, 14-93-01097-CR, 14-93-01095-CR, 14-93-01096-CR, 1996 WL 718465, at *8 (Ct. of Appeals Houston Div. Dec. 12, 1996) (holding, in the context of charges against the bribe payor pursuant to TCBS Section 32.43(c), "it is an offense to offer a benefit in consideration for a breach of fiduciary duty only if one knows (1) the offeree is a fiduciary; (2) the offeree acts without the consent of his beneficiary; and (3) the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary."); *In re: DePuy Orthopaedics, Inc.*, No. 3:13-cv-1071-K, 2016 WL 6271465, at *6 (N.D. Tex. Jan 5, 2016) ("There are five elements to the crime of commercial bribery: 1) intentionally or knowingly; 2) offering, conferring, or agreeing to confer a benefit; 3) to a fiduciary; 4) without the consent of the fiduciary's beneficiary; and 5) acceptance of that benefit would be in violation of Subsection b.").

executives with decades of experience with the company will testify that such policies are well known and that the acceptance of bribes by Citgo employees has been forbidden throughout their tenure with the company. They will further testify that no one was exempt from such policies, and that Citgo executives cannot "excuse" employees from compliance with Citgo policy. *See Preston v. State*, 934 S.W.2d 901, 906-07 (Tex. Ct. App. 1996) (upholding conviction under TCBS where evidence included vice-president's testimony that defendant was not authorized to accept money from a supplier).

The evidence at trial will show that other Citgo employees, including Nelson Martinez, Citgo's then-CEO, were also accepting bribes. Because of this evidence, the government expects De Jongh to argue that because others were committing the same crime that he was, Citgo somehow consented to all of their crimes.

Under the Texas Penal Code, consent is "assent in fact, whether express or apparent." Tex. Penal Code Ann. § 1.07(11) (West 2019). Any attempt by De Jongh to rely on Martinez's purported consent—whether explicit or implied—necessarily fails because, among other things, Martinez was not De Jongh's employer. Citgo was. De Jongh owed a fiduciary duty to Citgo, and it was up to Citgo to determine whether it was "okay" with its employee receiving an extra fee-for-service above and beyond his salary. *See* Ex. 3 at 34.

Committing a crime with a company's CEO does not mean that the company consents to the criminal act, particularly in a situation such as this, where the CEO does not own the company, but instead works with a board of directors to run the company in the best interests of its shareholder. Under De Jongh's theory, it would be impossible for a CEO to violate his fiduciary duty to the corporation because his own consent to actions, including those taken at the expense of the corporation, would be a stand-in for the consent of the corporation. That is not how corporations work. "The relationship of officers and directors to a corporation is a fiduciary one imposing upon them the duty to exercise their powers as officers and directors solely for the benefit of the corporation

28

and its stockholders.  Implicit in such duty is that of not exercising their powers as officers and directors to serve their own personal interest at the expense of the corporation and its stockholders." *Canion v. Texas Cycle Supply, Inc.*, 537 S.W.2d 510, 513 (Tex. Civ. App. 1976) (citing *Diedrick v. Helm*, 14 N.W.2d 913 (Minn. 1944)).

Any attempt to rely on corrupt Citgo employees in addition to Martinez will be similarly futile. "Everyone was doing it" is not a criminal defense, even when couched as "everyone was doing it, so actually there was consent."  *See SEC v. Pimco Advisors Fund Management LLC*, 341 F. Supp. 2d 454, 471-72 (S.D.N.Y. 2004) ("emphatically reject[ing]" defendant's argument that he should avoid liability because "he was one of many who did wrong"); *United States v. Rodriguez*, CR. No. 2:11-0296 WBS EFB, 2016 WL 5847008, at *1 (E.D. Cal. Oct. 5, 2016) (claiming that "everyone" in the industry was doing the same thing defendant in wire fraud case was accused of doing "does not tend to establish a good faith defense, does not negate [the defendant's] intent to defraud, and is thus irrelevant").

Martinez's role as a co-conspirator does not excuse De Jongh's acceptance of bribes from Citgo's perspective.  Rather, it means that both Martinez and De Jongh—and anyone else at Citgo who was accepting bribes in violation of Citgo policy—were breaching the duties they owed Citgo when they acted in furtherance of their personal interests instead of the best interests of the company.

3.  Any Purported Belief that Citgo Consented Is Not Objectively Reasonable.

In the event this court concludes that De Jongh's belief as to whether Citgo consented is an element under the statute it must, at most, be an objectively reasonable belief.  And here it was not. Confronted with an employer that could not have been clearer about its lack of consent to his misconduct, De Jongh is, presumably, attempting to shield himself by claiming that his own subjective belief regarding Citgo's consent prevented him from violating the TCBS.  Any claim that De Jongh *believed* that Citgo consented to his receipt of bribe payments is an attempt to raise an affirmative defense that he was mistaken in his belief regarding Citgo's consent.  "It is a defense to prosecution

that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." Tex. Penal Code Ann. § 8.02 (West 2019). Such a mistaken belief, however, must be a reasonable belief, and a reasonable belief is one "that would be held by an ordinary and prudent man in the same circumstances as the actor." Tex. Penal Code Ann. § 1.07(42).

Where there are policies in place that prohibit the conduct in question and certifications are required, it is not objectively reasonable to rely on the fact that the CEO or other employees are also taking bribes to conclude that the company consented. The fact that De Jongh lied on the certifications that he submitted is powerful proof that he knew Citgo did not consent.

Under Texas law, "[w]here the alleged mistaken fact is a matter that is readily discernable by a simple empirical method of investigation that is universally accepted, a mistake of fact defense is not raised by the accused's failure to properly utilize that method." *King v. State*, 919 S.W.2d 819, 821 (Tex. Ct. App. 1996) (when decedent had a pulse and was breathing prior to defendant's choking her, no mistake of fact was raised as to whether she was alive prior to his actions) (citing *Miller v. State*, 666 S.W.2d 564, 566 (Tex. Ct. App. 1984) (mistake about length of barrel of gun did not raise issue of mistake of fact in prosecution for possession of illegal weapon where simple measurement would have easily determined length)). If one were unsure as to whether one could accept payments from suppliers while employed by Citgo, the confused employee could readily access the company's policies and determine that such payments were prohibited—an extremely simple investigation, especially for someone who was a lawyer for the company and served for a time as an assistant to the Chief Compliance Officer.

Finally, De Jongh's actions belie his claim that he acted without Citgo's consent. De Jongh lied when asked to certify his compliance with Citgo policy each year; went to great lengths to conceal his involvement in the bribery scheme; directed Gonzalez, Farias, and others to send bribe payments

30

to offshore accounts in the names of shell companies; laundered bribe payments through multiple accounts; created fake invoices; and used a separate email address to discuss the scheme.  He did all of this because he *knew* he was acting without Citgo's consent, and in violation of the TCBS and the FCPA.

Respectfully submitted,

DANIEL S. KAHN                         JENNIFER B. LOWERY
ACTING CHIEF                           ACTING UNITED STATES ATTORNEY
FRAUD SECTION                          Southern District of Texas
Criminal Division
United States Department of Justice


*s/  Sarah E. Edwards*                  *s/  Robert S. Johnson*
SARAH E. EDWARDS                       ROBERT S. JOHNSON
TRIAL ATTORNEY                         ASSISTANT UNITED STATES
SONALI D. PATEL                        ATTORNEY
ASSISTANT CHIEF

Fraud Section, Criminal Division       U.S. Attorney's Office
U.S. Department of Justice             Southern District of Texas
1400 New York Avenue, N.W.             1000 Louisiana, Ste. 2300
Washington, D.C.  20005                Houston, TX 77002
Tel:     (202) 353-6761                Tel:     (713) 567-9706

## CERTIFICATE OF SERVICE

I hereby certify that, on March 15, 2021, I electronically filed the foregoing response with the

Clerk of the Court using the ECF/CM system for filing and service on all counsel of record.

*s/  Sonali D. Patel*
Sonali D. Patel
Assistant Chief
Fraud Section, Criminal Division
U.S. Department of Justice